**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANGELIQUE McKINNEY, as parent** | : | |
| **and natural guardian of EBONY** | : | **CIVIL ACTION** |
| **GAGE and RONALD LEWIS GAGE,** | : | |
| **JR., and in her own right,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PHILADELPHIA HOUSING** | : | |
| **AUTHORITY, *et al.*,** | : | **No. 07-4432** |
| **Defendants.** | : | |

## MEMORANDUM

**Schiller, J.**                                                                                          **April 20, 2010**

The Housing Choice Voucher Program ("HCVP") is a federal subsidized housing program in which qualified low-income individuals receive vouchers that they can use to lease private housing. (PHA Mot. for Summ. J. Ex. P-5 [Housing Choice Voucher Program Desk Manual] at 1-2.) Landlords who agree to participate in the HCVP enter into a Housing Assistance Payment ("HAP") contract with a local housing authority, which in turn pays some or all of the tenant's rent directly to the landlord. (*Id.*) Thus, the tenant has a lease with the landlord and the landlord has a separate contract with the local housing authority. (*Id.* Ex. D-86 at 1-12.) The HAP contract requires the landlord to maintain the premises in accordance with the department of Housing and Urban Development's ("HUD") Housing Quality Standards ("HQS"), codified at 24 C.F.R. §982.401. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. T [HAP Contract].) Federal regulations require that the local housing authority conduct inspections of homes covered by the program at least annually to ensure they comply with the HQS. 24 C.F.R. § 982.405(a).

In the present case, Plaintiffs were HCVP participants who allege that they were injured due

to unsafe conditions in the HCVP-approved home in which they lived. Specifically, they allege that damp conditions and the presence of harmful substances in the home such as mold caused and/or exacerbated Plaintiffs' asthma, including a tragic respiratory incident on March 18, 2006 that resulted in Plaintiff Ebony Gage being hospitalized for months and permanently brain damaged. (Sec. Am. Compl. ¶¶ 283, 294, 297.)

Plaintiffs bring this suit against their local housing authority, the Philadelphia Housing Authority ("PHA") and several of its employees (collectively, the "PHA Defendants") under two theories: (1) that the PHA Defendants violated Plaintiffs' civil rights "pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, the United States Housing Act of 1937, 42 U.S.C. § 1437, and the implementing regulations promulgated in connection therewith . . . all of which are remediable through 42 U.S.C. § 1983 . . . ."; and (2) that the PHA Defendants affirmatively exercised their authority in a manner that rendered Plaintiffs more vulnerable to danger and violated Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution. (Id. ¶¶ 315, 322–23.) Plaintiffs also are suing the owners of the property (defendants Robert Stahl, Jr. and Kathleen Stahl, or "the Stahls") and the purported managers of the property (defendants Artur Realty, Inc.; Artur Property Management; Artur Repairs; and Ernest Artur, Jr.; collectively "the Artur Defendants") under theories of negligence and negligence per se.

Currently before the Court are several motions for summary judgment filed by Defendants. For the reasons stated below, the motions are granted in part and denied in part.

## I.  BACKGROUND

### A.  1998:  The Stahls Purchase the Scattergood Property

On September 25, 1998, the Stahls purchased 1733 Scattergood Street, a home located in the Frankford section of Philadelphia ("the Scattergood property") from Karen A. & James T. Parisano ("the Parisanos").  (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. A [Agreement of Sale].)  As part of the sale, the real estate broker supplied the Stahls with a Seller's Property Disclosure Statement, which revealed, among other things, that there had been water leakage in the home's kitchen, basement, and roof.  (*Id.* Ex. B [Seller's Disclosure].)  On October 9, 1998, Karen Parisano wrote a letter addressed to "Mr. Artur" stating: "In response to the question on the Disclosure Statement, there is a leak in the basement on the wall in the back of the basement on the west side of the property somewhere around or near the window (facing my next door neighbor's property).  I don't know exactly where the leak is since I never had anyone come out to look at it and try to repair it."  (*Id.* Ex. C [Parisano Letter].)

In November of 1998, the Stahls agreed to pay Artur Realty a fee for finding a tenant for the Scattergood property and for collecting rent payments.  (Artur Defs.' Mot. for Summ. J. Ex. B [Listing to Rent Contract].)  The agreement explicitly noted that Artur Realty lacked authority to contract for repairs to the Scattergood property at the Stahls' expense.  (*Id.*)

### B.  1999:  Plaintiffs Lease the Scattergood Property

The Stahls, working with Ernest Artur and Artur Realty, sought to enroll the Scattergood property in the HCVP.  In June of 1999, a PHA inspector, Defendant Mike Regan, inspected the Scattergood property for a potential HCVP tenant and failed the property, citing numerous areas in which the property failed to comply with the HQS, including a broken toilet, broken wash basin,

deficient bathtub and shower, and work needed on the roof and gutters. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. G [June 1999 Inspection Checklist]; *Id.* Ex. H [June 1999 Violations List]; *Id.* Ex. I [June 1999 Inspection Failure Notice].)

On July 7, 1999, Plaintiff Angelique McKinney ("McKinney") received a voucher from the HCVP. (PHA Mot. for Summ. J. Ex. D-15 [Voucher].) On July 26, 1999, McKinney applied to rent the Scattergood property for herself and her two children, Ebony Gage, age 6, and Ronald Gage, Jr., age 1. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. K [Rental Application].) On July 27, 1999, McKinney signed a HUD "Request for Lease Approval" form, asking for the Scattergood property to be included in the HCVP. (*Id.* Ex. L [Request Form].) A PHA employee inspected the Scattergood property on September 8, 1999 and noted that it needed repairs. (*Id.* Ex. M [Appraisal Inspection].) That same day, PHA sent a letter to Artur Realty noting that the Scattergood property failed to meet the HQS, meaning that PHA would not enter into a HAP contract for that property until certain repairs were made. (*Id.* Ex. N [Sept. 8 Leasing Rental Determination].)

One day later, on September 9, 1999, the Scattergood property was inspected by PHA inspector Chuck Tomasello, who determined that the property failed. (*Id.* Ex. O [Tomasello Dep.] at 65.) A letter dated September 9, 1999 from PHA to Artur Realty states that "[n]otice is hereby given that an inspection was made at the [Scattergood Property] on 09/09/99 and the unit was found to be in violation of Housing Quality Standards. . . . When repairs are completed, contact V. Booth at [phone number] to request a re-inspection." (*Id.* Ex. Q [Sept. 1999 Inspection Failure Notice].) Records indicate that a second inspection of the home was conducted on September 9, 1999, by PHA inspector Al Fiorentino who determined that the home met the HQS. (*Id.* Ex. R [Sept. 1999 Inspection Pass].) On September 10, 1999, PHA sent Artur Realty a notice stating that an inspection

was made at the Scattergood property on September 9, 1999 and that the unit was in compliance with the HQS. (*Id.* Ex. S [Sept. 1999 Inspection Pass Notice].)

PHA and the Stahls entered into a HAP contract for the Scattergood property on September 20, 1999. (*Id.* Ex. T [HAP Contract].) Also on September 20, 1999, Ernest Artur, Jr., acting as agent for the Stahls, signed an "Owner's Certification of Compliance of Housing Quality Standards." (*Id.* Ex. U [Artur Certification].) That same day, McKinney entered into a lease for rental of the property. (*Id.* Ex. V [Lease].) The lease, signed by PHA and a representative of Artur Realty, stated that "[t]he owner must maintain the contract unit and premises in accordance with the HQS." (*Id.* § 9.)

McKinney and her two children, Ebony and Ronald, moved into the Scattergood property in October of 1999. (*Id.* Ex. W [McKinney Dep.] at 27.)

### C. 2000: Plaintiffs Complain of Leaks in Upstairs Toilet and Basement

On February 9, 2000, McKinney reported to the Artur Defendants that the toilet in the upstairs bathroom was leaking and causing the ceiling in the living room to cave in. (*Id.* Ex. Z [Tenant Memos].) Defendant Glenn Eric Cuff, a PHA inspector, performed an annually mandated HUD inspection on May 15, 2000, at which time he found that the Scattergood Property failed to meet the HQS. (*Id.* Ex. AA [May 2000 Inspection Failure].) Cuff's report specifically noted that the "ceiling areas" needed to be repaired. (*Id.*) PHA sent a Notice of Termination letter dated May 16, 2000 to the Artur Defendants advising that repairs were needed based on the May 15, 2000 inspection. (*Id.* Ex. BB [May 2000 Inspection Failure Notice].) Following a re-inspection of the home on June 20, 2000 by Defendant Anthony Toliver, another PHA inspector, PHA sent an Annual Inspection Approval Notice to the Artur Defendants on June 21, 2000 advising that the unit was in

HQS compliance. (*Id.* Ex. CC [June 2000 Inspection Pass Notice]; PHA Mot. for Summ J. Ex. P-21 [June 2000 Inspection Pass].)

Also in 2000, the water meter in the basement of the Scattergood property began leaking. (McKinney Dep. at 37–41.) McKinney placed a bucket underneath the meter to collect the dripping water, which she had to empty every three or four days. (*Id.* at 40.) She complained to the Artur Defendants about the issues. (*Id.*) McKinney met with a PHA Service Representative to inform PHA about the leaks in the home and about letters she was getting from PWD regarding her water meter. (*Id.* at 41.)

### D.     2001: Toilet and Water Heater Leak; Home Passes Inspection

On April 11, 2001, McKinney contacted the Artur Defendants to report that the toilet was still leaking. (Tenant Memos.) The Artur Defendants sent Breen's Cleaning Service to the home on April 20, 2001 to perform some maintenance work. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. DD [Breen April 20, 2001 Invoice].) McKinney again contacted the Artur Defendants on May 16, 2001, to complain that the water heater was leaking. (Tenant Memos.) On May 19, 2001, Breen's Cleaning Service installed a new water heater. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. FF [Breen May 19, 2001 Invoice].) On May 22, 2001, PHA inspector William O'Meara gave the home a passing inspection. (*Id.* Ex. GG [May 2001 Inspection Pass].)

### E.     2002: Home Passes Inspection; Leaks from the Tub; Ronald Develops Asthma

On May 21, 2002, O'Meara gave the Scattergood property another passing inspection. (*Id.* Ex. II [May 2002 Inspection Pass].) About two weeks later, McKinney contacted the Artur Defendants to complain about a leak coming from her tub. (Tenant Memos.) However, the Stahls

refused to make any repairs until the water bills were paid up to date. (*Id.*) By this time, Ronald Gage, Jr. developed asthma. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. Y [Schacter report] at 12.)

**F. 2003: Leaks from the Front Porch; Home Passes Inspection; Ebony Develops Asthma**

On June 12, 2003, McKinney reported to the Artur Defendants continuing problems with leaks from the front porch window and front porch roof—the same as those identified in the Seller's Disclosure in 1998 and the initial PHA inspection in 1999. (Tenant Memos; Seller's Disclosure; June 1999 Inspection Failure Notice.) Notwithstanding this fact, on August 8, 2003, an inspector from PHA identified only as the "E1 Team E Floater" gave the property a passing inspection. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. JJ [August 2003 Inspection].) By this time, Ebony Gage had developed asthma. (Schacter report at 12.)

**G. 2004: Leaks Continue; Home Not Inspected; PHA Gets Grant Describing Mold as an Asthma Trigger**

On February 16, 2004, McKinney reported to the Artur Defendants that the bathroom ceiling was leaking and the living room porch was leaking into the basement. (Tenant Memos.) According to the Artur Defendants' records, on April 2, 2004, "tenant called about leaks, tub leaks into living room, ruined furniture, porch window and roof on porch leaks, owner called back thinks this is serious will take care of." (*Id.*) Breen's Cleaning Service went to the property on April 3, 2004 to secure the front downspout to the wall, apply sealant to cracks between the front porch floor and the front of building where water was entering the house. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. MM [Breen April-May 2004 Invoice].) The Artur Defendants' record also indicated that the garbage disposal was leaking into an area beneath the sink. (*Id.*; McKinney Dep.

at 329–31.) Breen's Cleaning Service did not make repairs to the garbage disposal because Mr. Stahl owed money to Doris Breen, the owner of Breen's Cleaning Service. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. EE [Breen Dep.] at 68–70.)

Breen's Cleaning Service entered the property on April 10, 2004 to install new hot and cold water stems and knobs in the bathtub and to caulk the tub. (Breen April-May 2004 Invoice.) It also installed two new ceiling tiles that had experienced water damage, but did not inspect the area in the ceiling for the presence of mold. (*Id.*; Breen Dep. at 100–03.)

On June 2, 2004, McKinney went to the Artur Defendants' office to complain that the roof and garbage disposal were still leaking and had not been repaired. (Tenant Memos.) These repairs were not made, in part because Mr. Stahl owed money to Doris Breen. (*Id.*) On November 2, 2004, McKinney again contacted the Artur Defendants and complained that the "kitchen sink needs garbage disposal which was never replaced[;] porch roof leaking which causes leaking in basement[;] bathroom roof leaks[;] bathroom sink knobs just turn[;] toilet not working[;] kitchen lights flicker on and off[.]" (*Id.*)

PHA never inspected the Scattergood property in 2004, even though federal regulations require inspections be conducted at least annually.[1] (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. PP, [Manila Dep.] at 128–30; 24 C.F.R. § 982.405(a).) Yet PHA continued to pay full rent for the property. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. QQ [2004 HAP Payment History].)

Also in 2004, HUD awarded PHA a $1,000,000 grant for the Asthma Intervention and

---

[1] According to PHA Defendants, there was an appointment to inspect the Scattergood property on May 21, 2004, but the inspection could not be performed because no one was home. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. PP [Manila Dep.] at 128–30.)

Reduction (AIR) program. (*Id.* Ex. LL [Grant Information].) PHA's description of this grant identified "mold and moisture problems" as "asthma triggers" and noted that the project was "designed to reduce the number of asthma triggers in homes of developmental aged children living in Housing Choice Voucher homes." (*Id.*)

**H.      2005: Scattergood Property Fails Inspection; McKinney Gets Transfer Voucher**

McKinney again complained of leaks on April 9, 2005. (Tenant Memos.) The Artur Defendants' records indicate that they planned on "call[ing] owner but owner owes Doris money." (*Id.*) The Artur Defendants' records from April 12, 2005 note that "tenant came in stating that Bob [Stahl] will not do any repairs and the leak is messing up her personal belongings and she said she is not paying any rent." (*Id.*) The note indicated that Mr. Stahl authorized the Artur Defendants to send someone out to fix the leak, but there is no documentation suggesting that any repairs were made. (*Id.*)

On June 3, 2005, the Scattergood property failed a PHA inspection. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. RR [June 2005 Inspection Failure].) Among the reasons the PHA inspector, Defendant Ruby Jones, cited for failing the property were leaks in the garbage disposal, skylight, and porch ceiling. (*Id.*) PHA sent a Notice of Termination Letter to the Artur Defendants on June 6, 2005 advising that the unit failed the HQS inspection, and that a failure to meet HQS would result in immediate termination of the HAP contract. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. SS [June 2005 Inspection Failure Notice].) At around this time, McKinney met with a PHA service representative, Defendant Laverne French, to inform PHA that there was mold in the Scattergood property. (McKinney Dep. at 60.) At that meeting, French told McKinney that she could move to a different HCVP home only if the property failed inspection three

9

times. (*Id.* at 65.) Despite this assertion, McKinney was given a transfer voucher, which was to expire on October 14, 2005. (PHA Mot. for Summ. J. Ex D-12 [Transfer Voucher].) McKinney also provided the Artur Defendants with a 30-day notice of her intent to vacate the property, dated July 18, 2005.

## I.   2006: Scattergood Property Fails Again; Ebony Suffers Catastrophic Asthma Attack

On January 6, 2006, PHA inspector Defendant Vince Sherman inspected the unit and failed it, again citing multiple water leaks. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. ZZ [Jan. 2006 Inspection Failure].) On January 17, 2006, PHA sent a final termination notice to the Artur Defendants. (*Id.* Ex. AAA [Jan. 2006 Termination Notice].)

In late January 2006, after receiving several extensions on her transfer voucher, McKinney found a home that she wished to rent at 5041 Valley Street, Philadelphia, PA ("Valley St. property") with a landlord willing to participate in the HCVP. McKinney put down a security deposit for this home. (*Id.* Ex. BBB [Tenant Ledger] at 1.) In February of 2006, McKinney went to PHA's offices to complete the paperwork necessary for her to transfer to the new property, but was told that she needed to make an appointment. (McKinney Dep. at 110.) She was given an appointment for February 28, 2006. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. DDD [Feb. 28, 2006 Notice]; *Id.* Ex. CCC [French Dep.] at 206–07.) On February 28, 2006, McKinney completed the necessary paperwork. (*Id.* Ex. EEE [Family Packet].) However, PHA also required her to provide the Artur Defendants with 30 days notice of her intention to vacate the Scattergood Property. (Feb. 28, 2006 Notice, Ex. DDD.)

On March 18, 2006, tragedy struck at the Scattergood property. After midnight, Ebony Gage

suffered an asthma attack that caused severe brain damage. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. FFF [Johanning Report].) McKinney was not home at the time. The only other person in the house with Ebony at the time was her friend Nataya Stancil. (PHA Mot. for Summ. J. Ex. J [Stancil Dep.] at 34–35.) Ebony complained to Nataya that she could not breathe. (*Id.* at 40.) After several inhalers failed to help Ebony's breathing, Nataya called for help. (*Id.* at 42.)

Ebony was rushed to St. Christopher's Hospital where she remained for two months. (McKinney Dep. at 360.) She was in a coma from a lack of oxygen. (*Id.*) Ebony Gage returned home for the first time in December of 2006, where she continues to receive around-the-clock care. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Ex. HHH [Fried Report].)

PHA inspected the Valley St. property on March 21, 2006 and determined that it passed. (*Id.* Ex. P-72 [Valley St. Inspection Pass Notice].)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247–48 (1986). When the moving party does not bear the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable jury to find for it at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all

inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).

Furthermore, a court may not make credibility determinations or weigh the evidence in making its

determination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also*

*Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.    DISCUSSION

### A.    PHA Defendants' Motion

#### 1.    *Private Right of Action/42 U.S.C. § 1983*

The PHA Defendants move for summary judgment on Count I of Plaintiffs' Second

Amended Complaint, arguing that even if they violated provisions of the Housing Act or their

associated regulations, the claim fails because those provisions contain no private right of action and

cannot be enforced through 42 U.S.C. § 1983.[2]

Absent the creation of a personal right, there can be no private enforcement of a statute's

terms, under either section 1983 or any implied authority within the statute itself. *See Gonzaga*

*Univ. v. Doe*, 536 U.S. 273, 283–84 (2002); *Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth.*

---

[2] Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

"Section 1983 does not, by its own terms, create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

*of Pittsburgh*, 382 F.3d 412, 422 (3d Cir. 2004) ("[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action."). Therefore, this Court's inquiry must begin with a determination of whether the statutory provisions or regulations that Plaintiffs point to vest them with any personal rights. This is a matter of Congressional intent. *Gonzaga*, 536 U.S. at 285.

In *Blessing v. Freestone*, the Supreme Court articulated three factors that it had traditionally looked at when determining whether a particular statutory provision gives rise to a federal right: (1) whether Congress intended that the provision in question benefit the plaintiff; (2) whether the right assertedly protected by the statute is vague and amorphous; and (3) whether the provision giving rise to the asserted right was couched in mandatory, rather than precatory, terms. 520 U.S. 329, 340–41 (1997). Five years later, the Court was presented with the question of whether a plaintiff could bring a lawsuit under section 1983 to enforce provisions of the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g, which prohibits the federal funding of educational institutions that have a policy or practice of releasing education records to unauthorized persons. *Gonzaga*, 536 U.S. at 276. The Court noted that "[s]ome language in our opinions might be read to suggest that something less than an unambiguously conferred right is enforceable by § 1983," and that some courts had interpreted the *Blessing* factors to mean that "plaintiffs [can] enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect." *Id.* at 282–83. Dispelling this misconception, the Court in *Gonzaga* "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* at 283.

13

Though the Court in *Gonzaga* did not overrule *Blessing*, it did not apply the *Blessing* factors in determining whether the FERPA provisions at issue created any personal rights. Instead, the Court examined whether the statutory provisions contained "rights creating language" and whether they "speak only in terms of institutional policy and practice" and have an "aggregate focus," as opposed to being "concerned with whether the needs of any particular person have been satisfied." *Id.* at 287, 288 (internal quotation marks omitted).

According to the Third Circuit, "*Gonzaga Univ.* clarified the Blessing analysis by adding the requirement that any such right be unambiguously conferred by Congress." *Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 526 (3d Cir. 2009); *see also Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 189 (3d Cir. 2004) (examining the *Blessing* factors in addition to whether Congress used rights-creating language in the statute). *But see Three Rivers*, 382 F.3d 412 (applying *Gonzaga* factors, but not *Blessing* factors, in determining that plaintiffs did not have right of action to enforce HUD regulations under section 504 of the Rehabilitation Act). Therefore, in order to determine whether Plaintiffs have a private right of action to enforce the statutes and regulations they cite, this Court will examine the *Blessing* factors and also assess whether Congress unambiguously conferred personal rights on the Plaintiffs. "This analysis . . . is assuredly not for the timid." *Sabree*, 367 F.3d at 183.

Plaintiffs claim a private right of action under the Housing Act, pointing particularly to 42 U.S.C. §§ 1437f(o)(8) and 1437d(f). Section 1437f(o)(8) states: "[F]or each dwelling unit for which a housing assistance payment contract is established under this subsection, the public housing agency shall inspect the unit before any assistance payment is made to determine whether the dwelling unit meets the housing quality standards under subparagraph (B)." 42 U.S.C. § 1437f(o)(8)(A). Section

14

1437d(f) states, in relevant part: "(1) Each contract for contributions for a public housing agency shall require that the agency maintain its public housing in a condition that complies with . . . the housing quality standards . . . . (2) The Secretary shall establish housing quality standards . . . that ensure that public housing dwelling units are safe and habitable. . . ." 42 U.S.C. § 1437d(f).

The statutory provisions here satisfy the *Blessing* factors. Congress enacted these provisions with an intent to benefit tenants in publicly subsidized housing, such as Plaintiffs, by ensuring that they are living in decent quarters. Second, Congress's mandates in these sections are not so "vague and amorphous" that enforcement thereof would strain judicial competence. Courts are quite capable of examining HUD contracts and regulations to ensure that they satisfy the statutory requirements, and can determine whether appropriate inspections were made. Third, the statutory provisions use the term "shall," meaning that the provisions giving rise to the asserted right are phrased in mandatory, not precatory, terms.

However, as the Third Circuit has noted, "our inquiry does not end there." *Sabree*, 367 F.3d at 189. The *Blessing* factors merely establish that a plaintiff "falls within the general zone of interest that the statute is intended to protect; something less than what is required for a statute to create rights enforceable directly from the statute itself . . . ." *Gonzaga*, 536 U.S. at 283. Even if a statutory provision satisfies the *Blessing* factors, it still must confer a right in order to be privately enforceable. *Id.* ("[I]t is *rights,* not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority [of section 1983].") To determine if the statutory provisions at issue here confer personal rights, the Court must examine the text and structure of the statute. *Id.* at 286. Here is where the heavy lifting must be done.

In *Gonzaga*, the Supreme Court compared the statutory language of the FERPA with that in

Title VI of the Civil Rights Act of 1964 ("Title VI") and Title IX of the Education Amendments of 1972 ("Title IX"), which the Court held out as exemplars of rights-creating language. *Gonzaga*, 536 U.S. at 283–84 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)). Title VI provides: "No person in the United States shall . . . be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race, color, or national origin. 42 U.S.C. § 2000d. Title IX provides: "No person in the United States shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). While Title VI and Title IX contained "individually focused terminology . . ., FERPA's provisions speak only to the Secretary of Education, directing that '[n]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice.'" *Gonzaga*, 536 U.S. at 287 (citing 20 U.S.C. § 1232g(b)(1)). In terms of statutory structure, the Court noted that the FERPA had a programmatic and aggregate focus, as opposed to a "concern[] with 'whether the needs of any particular person have been satisfied.'" *Id.* at 288 (quoting *Blessing*, 520 U.S. at 344). Although references to the individual appear throughout the FERPA, "[i]n each provision the reference . . . is in the context of describing the type of 'policy or practice' that triggers a funding prohibition." *Id.* The Court also pointed out that Congress "expressly authorized the Secretary of Education to 'deal with violations' . . . and required the Secretary to 'establish or designate [a] review board,'" meaning that even without private enforcement via the judiciary, aggrieved individuals would have an opportunity to challenge the disputed conduct. *Id.* at 289–90 (citing 20 U.S.C. § 1232g).

In *Sabree*, the Third Circuit found that several provisions of Title XIX of the Social Security Act ("Title XIX") were privately enforceable via section 1983. 367 F.3d at 181. Those provisions

provided that "[a] State plan for medical assistance *must . . . provide* that *all individuals* wishing to make application for medical assistance under the plan shall have opportunity to do so, and that *such assistance shall be furnished with reasonable promptness to all eligible individuals*," 42 U.S.C. § 1396a(a)(8) (emphasis added), and that "[a] State plan for medical assistance *must . . . provide . . .* for making medical assistance available, . . . *to . . . all* [eligible] *individuals . . . .*" 42 U.S.C. § 1396a(a)(10) (emphasis added). Starting, as did the Court in *Gonzaga*, with the statutory language and comparing it to the undoubted rights-creating language in Title VI and Title IX, the court in *Sabree* "f[ou]nd it difficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant Title XIX language—'A State plan must provide'—from the 'No person shall' language of Titles VI and IX." *Sabree*, 367 F.3d at 190. The Court also noted that the text in the relevant statutory provisions focused on the "individuals" for whose benefit the statute was passed as opposed to the regulated entity and was phrased in mandatory, not precatory terms. *Id.* Examining Title XIX's statutory structure, the court in *Sabree* noted that the existence of rights-creating language in other relevant provisions of Title XIX buttressed the conclusion that the provisions at issue in that case created personal rights. *Id.* at 192.

In *Grammer*, the Third Circuit held that provisions of the Federal Nursing Home Reform Amendments (FNHRA), 42 U.S.C. § 1396r, created personal rights that could be enforced using section 1983. Among the provisions the plaintiff in *Grammer* sought to privately enforce was 42 U.S.C. § 1396r(c)(1)(A)(i), which provided that, "[a] nursing facility must protect and promote the rights of each resident, including: the right to choose a personal attending physician . . . ." The Third Circuit found that the statutory language at issue created personal rights, as it used the word 'residents' throughout and thus, its provisions are clearly "phrased in terms of the persons

benefitted." *Grammer*, 570 F.3d at 529–30.  The court noted that "the FNHRA are constructed in such a way as to stress that these 'residents' have explicitly identified rights." *Id.* at 530.  Thus, the FNHRA were "concerned with 'whether the needs of any particular person have been satisfied,' not solely with an aggregate institutional policy and practice." *Id.* (quoting *Gonzaga*, 536 U.S. at 288). In terms of statutory structure, the court found that "[t]he language used throughout the FNHRA is explicitly and unambiguously rights-creating, despite the countervailing elements of the statute." *Id.* at 532.

In *Newark Parents Association v. Newark Public Schools*, the Third Circuit held that the notification and supplemental educational services provisions of the No Child Left Behind Act (NCLBA) did not create personal rights enforceable via section 1983.  547 F.3d 199, 200 (3d Cir. 2008).  The NCLBA, enacted under Congress's spending power, conditions the receipt of certain federal education funding on state educational agencies complying with the NCLBA's provisions. *Id.*  For example, local school agencies must notify parents whose children's schools  are failing to make adequate progress toward their yearly educational goals and of the agency's plan to improve the situation.  20 U.S.C. § 6316(b)(6)(A)-(E).  This written explanation must also provide "an explanation of the parents' option to transfer their child to another public school . . . or to obtain supplemental educational services for the child." *Id.* § 6316(b)(6)(F).  The NCLBA also requires that "the local educational agency serving such school shall . . . arrange for the provision of supplemental educational services to eligible children in the school from a provider with a demonstrated record of effectiveness, that is selected by the parents and approved for that purpose by the State educational agency in accordance with reasonable criteria . . . ." *Id.* § 6316(e)(1).  The Act also provides that "a local educational agency that receives funds under this part shall notify the

parents of each student attending any school receiving funds under this part that the parents may request, and the agency will provide the parents on request (and in a timely manner), information regarding the professional qualifications of the student's classroom teachers . . . ." *Id.* § 6311(h)(6)(A).

A group of parents brought a section 1983 lawsuit against Newark Public Schools, claiming that they did not receive the requisite notice under the NCLBA. *Id.* at 202–03. Analyzing the statutory text, the Third Circuit found that the notification and supplemental educational services provisions under which the parents sued did not contain rights-creating language. *Id.* at 210–11. Unlike Titles VI and IX—"the two exemplars of rights-creating language cited by the *Gonzaga* Court"—and Title XIX, which the *Sabree* court found to be linguistically indistinguishable from Titles VI and XI, the NCLBA provisions at issue in *Newark Parents* are focused "on the entity regulated and [are] at least one step removed from the interests of individual students and parents." *Id.* at 210. As the court put it, "[i]n the NCLBA, there are two subjects: the primary subject is always the State and the 'local educational agency,' while 'the parents of each student' are the secondary subject—they benefit from the provision but only as a result of regulation imposed upon the State and its actors." *Id.* Furthermore, "[t]he NCLBA's general structure . . . speak[s] in terms of an agreement between Congress and a particular State" rather than of the rights of individual children. *Id.* at 212. The court also pointed to the appropriations and enforcement provisions of the NCLBA, which "evince an agreement between Congress and the States, rather than the creation of individual rights." *Id.* Those portions of the statute do not mention individuals, but instead specify the conditions under which Congress would and would not provide money to state educational agencies. *Id.*

The cases indicate an identifiable taxonomy, where certain kinds of statutory language clearly create personal rights and other kinds do not. When the subject of the statutory language is the party for whose benefit the statute is intended, such as in Titles VI and IX ("No person . . . shall be subjected to discrimination") Congress has shown an "unmistakable focus on the benefited class" and it is clear that the statute confers a personal right. *See Cannon*, 441 U.S. at 691–93. When the subject of the statutory language is not the intended beneficiary, but the statutory provision mandates that a regulated entity provide an enumerated right to an enumerated beneficiary, the Third Circuit has concluded that the statute creates personal rights. This is because these cases are "difficult, if not impossible, as a linguistic matter, to distinguish" from cases in which the intended beneficiary of the statute is the subject of the statutory language. *See Sabree*, 376 F.3d at 190. Examples include the statutory language in *Sabree*, which mandated that state medical assistance plans ensure that medical assistance *shall be furnished* with reasonable promptness to *all eligible individuals*, and *Grammer*, which required nursing facilities to protect and promote the *rights* of *each resident*, including the right to choose a personal attending physician. *See* 367 F.3d at 189; 570 F.3d at 529. However, when the statutory language speaks of a primary subject—the object of the regulation—and a secondary subject, who benefits from the regulation of the primary subject, no personal rights are created. *See Newark Parents*, 547 F.3d at 210. Such language does not speak of the rights or entitlements of the secondary subject, but only of the obligations of the primary subject. Because the focus of these statutes "is on the entity regulated and is at least one step removed from the interests of" the intended beneficiary, courts will not find personal rights in such cases. *See id.*

Given this framework, the Court determines that neither of the Housing Act provisions

Plaintiffs point to in the present case create personal rights. The statutes Plaintiffs seek to enforce, 42 U.S.C. §§ 1437f(o)(8) and 1437d(f),[3] do not even mention the intended beneficiary of the regulation. Certainly, if the focus of the NCLBA notification provisions at issue in *Newark Parents* that required local school agencies to give certain notice to parents is "one step removed" from the interests of the intended beneficiary, then the statutory provisions here, which do not even mention the intended beneficiary, are even further removed. *See Newark Parents*, 547 F.3d at 210.

Section 1437f(o)(8) does not include rights-creating language. *See Gonzaga*, 536 U.S. at 287. It dictates the conduct required of regulated agencies rather than enumerating the rights of individual tenants receiving public rent subsidies. *See Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981))). Unlike Titles VI and IX, whose focus on the individual make them the archetypical rights-creating statutes in this line of jurisprudence, section 1437f(o)(8) does not even mention the individual whom the statute is intended to benefit. While the statutory provisions in *Sabree* and *Grammer* speak of the regulated entity's obligation to the individual beneficiary, section 1437f(o)(8) speaks only of the housing agency's obligation.

With respect to statutory structure, the Housing Act has an "'aggregate' focus" and does not

---

[3] Section 1437f(o)(8) states "[F]or each dwelling unit for which a housing assistance payment contract is established under this subsection, the public housing agency shall inspect the unit before any assistance payment is made to determine whether the dwelling unit meets the housing quality standards under subparagraph (B)." 42 U.S.C. § 1437f(o)(8)(A). Section 1437d(f) states, in relevant part: "(1) Each contract for contributions for a public housing agency shall require that the agency maintain its public housing in a condition that complies with . . . the housing quality standards . . . . (2) The Secretary shall establish housing quality standards . . . that ensure that public housing dwelling units are safe and habitable. . . ." 42 U.S.C. § 1437d(f).

speak in terms that express a "concern[] with 'whether the needs of any particular person have been satisfied.'" *Gonzaga*, 536 U.S. at 288 (quoting *Blessing*, 520 U.S. at 344). Most provisions of the Housing Act focus on the authority and obligations of the HUD Secretary or, like section 1437f(o)(8), on the obligations of recipients of federal funds (the public housing agencies). The statute as a whole therefore lacks an "unmistakable focus on the benefited class." *See id.* at 284 (quoting *Cannon*, 441 U.S. at 691).

The same is true of section 1437d(f), which deals with housing quality standards. This statutory language is phrased in terms of the obligations imposed on the public housing agency and not on the rights of individual tenants. The focus again is on institutional policy of regulated entities, not specific wrongs suffered by specific individuals. This is not rights creating language and therefore cannot support a private cause of action to enforce these statutory provisions.

Plaintiffs cite to cases in which courts have held that certain provisions of the Housing Act are privately enforceable through section 1983. In *Wright v. City of Roanoke*, the Supreme Court held that private litigants could bring a cause of action under section 1983 to enforce the "Brooke Amendment" to the Housing Act, 42 U.S.C. § 1437a, which states that a low-income family receiving federal housing subsidies "shall pay as rent" a certain specified portion of its income. 479 U.S. 418, 419–20 (1987). In *Farley v. Philadelphia Housing Authority*, the Third Circuit held that a tenant has a personal right enforceable through section 1983 to enforce section 1437d(k) of the Housing Act. 102 F.3d 697, 703–04 (3d Cir. 1996). That provision of the Act says that the HUD Secretary "shall . . . establish and implement an administrative grievance procedure under which *tenants will have an opportunity* for [an impartial] hearing [and to] examine relevant documents" and will "be entitled to" be represented at any hearing, examine witnesses, and receive a written

decision.  42 U.S.C. § 1437d(k).

As the Supreme Court has since noted, the key to its analysis in *Wright* "was that Congress spoke in terms that 'could not be clearer,' and conferred entitlements 'sufficiently specific and definite to qualify as enforceable rights.'" *Gonzaga*, 536 U.S. at 280 (quoting *Wright*, 479 U.S. at 430, 432).  The provisions of the Housing Act relevant to this case differ markedly from the provision at issue in *Wright* with respect to specificity and focus.  Section 1437a, as amended at the time of the *Wright* decision, placed specific caps on the amount that a family receiving government housing subsidies would have to pay in rent.  This "specific monetary entitlement[]" was enough to establish a personal right, enforceable under section 1983.  *Gonzaga*, 536 U.S. at 280.  The sections of the Housing Act under which Plaintiffs sue do not give any such specific entitlement to tenants.  They do not even mention tenants.

*Farley* is similarly distinguishable. While section 1437d(k) begins with the invocation "The Secretary shall," it lays out in great detail the procedures to which tenants would be entitled should they file an administrative grievance, including a hearing before an impartial decision-maker, in which the tenant would be entitled to be represented and to ask questions of witnesses.  42 U.S.C. § 1437d(k).  The particularity with which section 1437d(k) lays out a tenant's entitlement differentiates it from sections 1437f(o)(8) and 1437d(f), which set forth the required contents of HUD's contracts with public housing agencies and the housing agencies' duties with respect to inspections, but says nothing about any entitlements for tenants.  While these statutory provisions are clearly for the benefit of tenants, "it is *rights,* not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [section 1983]." *Gonzaga*, 536 U.S. at 283.

That select provisions of a statute are privately enforceable does not mean that the entire

23

statute is similarly capable of private enforcement. The Supreme Court has cautioned that courts should consider specific statutory provisions as opposed to a statute as a whole in determining whether an enforceable right exists. *Blessing,* 520 U.S. at 342–43. *Wright* has been on the books for over twenty years, and in that time numerous cases have adjudged provisions of the Housing Act unenforceable via section 1983. *See Johnson v. City of Detroit*, 446 F.3d 614, 626-27 (6th Cir. 2006); *Banks v. Dallas Hous. Auth.*, 271 F.3d 605, 606 (5th Cir. 2001); *Perry v. Hous. Auth. of Charleston,* 664 F.2d 1210, 1215 (4th Cir. 1981) (no private right of action to enforce § 1437f); Gilchrist v. Bakshi, Civ. A. No. 09-415, 2009 WL 4909439, at **1, 3 (D. Md. Dec. 10, 2009); *Imes v. Phila. Hous. Auth.*, 928 F. Supp. 526, 530 (E.D. Pa. 1996) ("[T]he Court concludes that the § 1437d(l) [of the Housing Act] and associated regulations cited by Plaintiffs do not create rights enforceable under § 1983 to housing in 'decent, safe, and sanitary condition' or to necessary repairs."). Furthermore, even crediting Platintiffs' arguments that the structure of the Housing Act as a whole shows an intent to create personal rights, the Third Circuit has noted that "courts should balance the strength of the specific language of the statutory provisions at issue against the larger structural elements of the statute." *Grammer*, 570 F.3d at 532. Here, whatever structural elements of the statute suggest a personal right are far outweighed by the utter lack of rights-creating language in the specific statutory provisions on which Plaintiffs rely.

Since the statutory provisions under which Plaintiffs bring their claims against PHA are not privately enforceable, neither are the regulatory provisions they cite. *See Sandoval*, 532 U.S. at 291 ("[I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress."); *Three Rivers*, 382 F.3d at 424 ("[A] regulation cannot 'create a right enforceable through section 1983 where the alleged right does not appear

explicitly in the statute, but only appears in the regulation.'" (quoting *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 274 F.3d 771, 781 (3d Cir. 2001))).

Therefore, the Court concludes that Plaintiffs do not have a private right of action to enforce 42 U.S.C. §§ 1437f(o)(8), 1437d(f), or their associated regulations under either 42 U.S.C. § 1983 or an implied right of action, because those provisions of law do not create personal rights.

### 2.    *State-Created Danger*

Count II of Plaintiffs' Complaint also charges PHA Defendants with violating their substantive due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.  Specifically, they bring a claim under the so-called "state-created danger doctrine." PHA Defendants move for summary judgment, saying that Plaintiffs cannot prove two of the four elements necessary to succeed on a state-created danger claim.

The origins of the state-created danger doctrine trace back to the Supreme Court case of *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989).  In *DeShaney*, a young boy was repeatedly abused by his father, with whom he lived.  *Id.* at 191.  Social workers and other county officials had reason to believe that this abuse was occurring but did not remove the boy from his father's custody.  *Id.*  Eventually, the boy's father beat him so badly that the boy fell into a life-threatening coma, causing him permanent brain damage.  *Id.* at 192.  The boy and his mother brought a section 1983 lawsuit against the County, alleging that respondents had violated his due process rights by failing to intervene and protect him from his father.  The Court rejected the boy's claim, saying that "while the State may have been aware of the dangers that [the boy] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201.  The Court also noted that the state "placed [the boy] in no worse position than

that in which he would have been had it not acted at all." *Id.*

Subsequent to *DeShaney*, the Third Circuit held that if the government created the danger to which a plaintiff was subjected or done something to render him more vulnerable to that harm, then the government could be held liable under the state-created danger theory. *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996). To establish a claim based on the state-created danger doctrine, a plaintiff must satisfy the following elements: (1) the harm caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) some relationship existed between the state and the plaintiff that renders plaintiff a foreseeable victim; and (4) "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Bright v. Westmoreland County,* 443 F.3d 276, 281 (3d Cir. 2006) (citations omitted).

PHA Defendants contend that Plaintiffs' evidence is legally insufficient to establish the second (conscience shocking) and fourth (affirmative act) elements of the state-created danger cause of action. Furthermore, PHA contends that Plaintiffs cannot prove that the alleged wrongs it committed were the result of a policy or custom and thus cannot hold it liable in a section 1983 action.

> a. *Conscience Shocking Behavior*

The degree of culpability a plaintiff needs to allege under the "shocks the conscience" standard "depends upon the particular circumstances that confront those acting on the state's behalf." *Schieber v. City of Phila.*, 320 F.3d 409, 417 (3d Cir. 2003). "Where a defendant is confronted with a hyperpressurized environment such as a high-speed chase . . . it is usually necessary to show that the officer deliberately harmed the victim." *Kaucher v. County of Bucks*, 455 F.3d 418, 426 (3d Cir.

2006) (internal citations and quotation marks omitted). But, "[w]here a defendant has the luxury of proceeding in a deliberate fashion . . . deliberate indifference may be sufficient to shock the conscience." *Id.* (internal citations and quotation marks omitted). Even if PHA inspections only take a few minutes, there is no indication that the process "involve[d] the hyperpressurized environment of an in-progress prison riot or a high-speed chase." *Estate of Smith v. Marasco*, 318 F.3d 497, 508 (3d Cir. 2003) ("*Smith I*") (internal citations and quotation marks omitted). The decisions PHA made in this case—e.g. determining whether the Scattergood property passed inspection—were ones in which "actual deliberation [was] practical." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998). Therefore, the standard is deliberate indifference—knowledge on the defendant's part of a strong likelihood of harm to the plaintiff and failure of the defendant to take reasonable efforts to address that risk. *See Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1024–25 (3d Cir. 1991).

Sufficient evidence exists that PHA acted with deliberate indifference to present the question to a jury. In April of 1999, HUD issued a report identifying several areas where intervention "can be expected to protect children from many adverse health outcomes." (Pl.'s Resp. in Opp'n to PHA's Mot. for Summ. J. Ex. E [Healthy Homes Initiative Report] at 4.) Among the areas identified was excess moisture. (*Id.*) In 2004, PHA applied for and received a $1,000,000 grant from HUD for the "Asthma Intervention and Reduction" (AIR) project. (*Id.* Ex. LL [AIR Grant Information].) PHA's description of the project identified "mold and moisture problems" as asthma triggers. (*Id.*) Furthermore, the PHA's inspections of the Scattergood property could easily lead a jury to find that PHA was aware of leaks and excess moisture in the house. Despite this, the PHA approved the Scattergood property for inclusion in the HCVP, continued to make rental payments on the home,

and obstructed Plaintiffs in their efforts to move out of the home. Thus, the Court finds that there is sufficient evidence to ask the jury whether PHA's conduct is conscience-shocking.

b.    *Affirmative Acts*

PHA Defendants also argue that they are entitled to summary judgment because Plaintiffs' complaints deal not with acts but with failures to act. What Plaintiffs describe as the affirmative act of including the Scattergood property in the HCVP, PHA Defendants describe as the automatic consequence of an alleged failure to properly inspect the home. Where Plaintiffs see PHA continuing to make rental payments, the PHA sees a failure to terminate contract payments. Furthermore, PHA Defendants contend that even if there is an affirmative act at issue, such act was not the cause of Plaintiffs' harm, either because the act was too remote from the injury or because Plaintiffs' failure to move out of the Scattergood property broke the causal chain.

This Court is reminded that "the line between an affirmative act and an omission is difficult to draw." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 914 (3d Cir. 1997). The cases in which the Third Circuit has found that Plaintiff failed to meet the "affirmative act" element have generally dealt with scenarios in which private actors harmed plaintiffs and the state was accused of failing to intervene to protect the plaintiff. *See, e.g.*, *Bennett v. City of Phila.*, 499 F.3d 281, 289 (3d Cir. 2007) (holding that city agency did not affirmatively act to increase risk to young girls by closing out their dependency case); *Kaucher v. County of Bucks*, 455 F.3d 418 (3d Cir. 2006) (finding accusation that jail officials created conditions conducive to the spread of infection was not an affirmative act increasing risk of harm to plaintiffs); *Bright v. Westmoreland County*, 443 F.3d 276 (3d Cir. 2006) (holding that police had not affirmatively used their authority in a manner that increased a young girl's vulnerability to her eventual killer by warning him to stay away from the

28

girl's family but not arresting him); *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1374–75 (3d Cir. 1992) (en banc) (holding that school did not affirmatively act to create danger of sexual assault by assigning students to a particular class and failing to put a stop to non-sexual assaults in the class). Vital to those cases was the fact that the harmful conduct to which the plaintiffs were subjected would have come about even without the government conduct of which plaintiffs complained. *See Bennett*, 499 F.3d at 289 ("Appellants failed to demonstrate a material issue of fact that the City used its authority to create an opportunity for the Bennett sisters to be abused that would not have existed absent DHS intervention."); *Kaucher*, 455 F.3d at 433–34 (noting that infections at jail would have occurred even without defendant's conduct); *Bright*, 443 F.3d at 285 ("[T]he only affirmative exercise of state authority alleged in this case—the so-called 'confrontation'—'placed [the Brights] in no worse position than that in which [they] would have been had [the state] not acted at all.'" (quoting *DeShaney*, 489 U.S. at 201) (alterations in original)); *D.R.*, 972 F.2d at 1374 ("[T]he school defendants did not create plaintiffs' peril, increase their risks of harm, or act to render them more vulnerable to the student defendants' assaults.")

In contrast, the cases in which the Third Circuit has held that a state-created danger claim could go to a jury have involved situations where, but for the government's acts, the plaintiff would have been less vulnerable to the harm she suffered. In *Kneipp*, police stopped a husband and wife who were arguing on a public road. 95 F.3d at 1201. The husband and wife were walking home on a cold winter evening after drinking at a tavern. *Id.* After answering questions from one officer, the husband walked across the street to speak with other officers. *Id.* at 1202. He told one of the officers that he needed to go home to relieve the babysitter and asked if he could leave. *Id.* The officer responded, "yeah, sure." *Id.* The husband left, assuming that the police officers would take

care of his obviously intoxicated wife. *Id.* Instead, the officers left the wife by herself to make it back home, which was one-third of a block away. *Id.* at 1201–02. The wife was found unconscious approximately one and a half hours later at the bottom of an embankment. *Id.* at 1203. Exposure to the cold caused her permanent brain damage. *Id.* The District Court granted the defendants' motion for summary judgment, saying that the plaintiffs had failed to prove a constitutional violation under the state-created danger theory. *Id.* at 1204. The Third Circuit reversed, stating:

> The conduct of the police, in allowing Joseph to go home alone and in detaining Samantha, and then sending her home unescorted in a seriously intoxicated state in cold weather, made Samantha more vulnerable to harm. It is conceivable that, but for the intervention of the police, Joseph would have continued to escort his wife back to their apartment where she would have been safe. A jury could find that Samantha was in a worse position after the police intervened than she would have been if they had not done so.

*Id.* at 1209.

In *Rivas v. City of Passaic*, emergency medical technicians (EMTs) responded to an emergency call and found Rivas experiencing a seizure. 365 F.3d 181, 185 (3d Cir. 2004). The EMTs had been trained to not disturb or restrain a person during a seizure, and to ensure that the seizure victim's airways remain open. *Id.* at 194. Rivas allegedly became violent so the EMTs called for police backup, but they neglected to inform the police of Rivas's medical condition. *Id.* at 185–86. The responding police officers touched Rivas, which allegedly caused him to become very aggravated and aggressive. *Id.* at 186. A physical altercation ensued in which police and Rivas ended up on the floor. *Id.* at 186–87. Ultimately, the police restrained Rivas and placed him face down on a stretcher. *Id.* at 187–88. After this commotion had ended, EMTs noticed that Rivas was not breathing. *Id.* at 188. Shortly thereafter, Rivas died. *Id.*

The Third Circuit held that the plaintiffs' state-created danger claim survived summary

judgment.  *Id.* at 194.  The Court stated:

> A reasonable factfinder could conclude that the EMTs' decision to call for police backup and then (1) inform the officers on their arrival that Mr. Rivas had assaulted [one of the EMTs], (2) not advise the officers about Mr. Rivas's medical condition, and (3) abandon control over the situation, when taken together, created an opportunity for harm that would not have otherwise existed.  Were it not for those acts, Mr. Rivas presumably could have remained in the apartment's bathroom for the duration of his seizure without incident.

*Id.* at 197.

Plaintiffs maintain that the following were affirmative acts that rendered them more vulnerable to harm than if the PHA had not acted at all: (1) approving the Scattergood property for the HCVP; (2) making rental payments on the home; (3) delaying Plaintiffs' ability to vacate the home by requiring McKinney to make an appointment to submit her paperwork and to give the landlord 30 days notice before vacating.  PHA Defendants counter that the gravamen of these claims is that the PHA *failed* to detect the allegedly dangerous conditions in the house and intervene to protect Plaintiffs.

Plaintiffs in this case have raised a triable issue of fact as to whether PHA acted affirmatively and thereby left Plaintiffs more vulnerable to harm.  A jury could find that PHA took steps, such as approving the house and making rental payments without which the Plaintiffs would never have lived at the Scattergood property or have been exposed to the alleged dangers therein.  In addition, a jury could find that PHA acted with deliberate indifference when it slowed Plaintiffs' exit from the Scattergood property, thereby exposing them to greater risks than they would have faced were they permitted to move.  These are, in the most literal sense, affirmative acts that rendered Plaintiffs more vulnerable to the harms inside the home.  The Court rejects PHA's contention that these were, as a matter of law, failures to act.  Just as the Third Circuit in *Rivas* viewed the EMTs' conduct as

affirmative acts rather than a failure to intervene and the police's conduct in *Kneipp* as affirmative acts rather than a failure to aid the plaintiff, this Court views the PHA's conduct—approving the Scattergood property for the HCVP, paying rent on the Scattergood property, and requiring Plaintiffs to make an appointment and give notice before moving—as affirmative acts.

PHA Defendants also argue that the acts of which Plaintiffs complain are not the cause of Plaintiffs' injuries. "[A] specific and deliberate exercise of state authority, while necessary to satisfy the fourth element of the [state-created danger] test, is not sufficient. There must be a direct causal relationship between the affirmative act of the state and plaintiff's harm." *Kaucher*, 455 F.3d at 432. The Third Circuit has described this as a requirement that the state's action be the "but for cause" of the plaintiff's injuries. *Id.* PHA Defendants argue that the time between the alleged acts and the harm Plaintiffs suffered, and the fact that Plaintiffs did not move out of the Scattergood property earlier than they did breaks the causal chain.

But for PHA's approval of the Scattergood property, Plaintiffs would not be living there and never would have been exposed to the alleged dangers therein. Without PHA's payment of the rent for the Scattergood property, Plaintiffs would not be living in the home and exposed to its damp air. And but for the alleged appointment and notice requirement, Plaintiffs almost certainly would have been out of the Scattergood property earlier and faced less exposure to the alleged dangers within the home. Thus, on their face, PHA's acts were but-for causes of Plaintiffs' harm.

The Court rejects the argument that McKinney's conduct—failing to make repairs on her own or to move out earlier—somehow breaks the causal chain. Plaintiffs' ability to move was severely limited by the HCVP. PHA was paying the entirety of Plaintiffs' rent. Plaintiffs lacked the means to repair persistent leaks inside of the home or simply pick up and move to a different home without

government assistance. This Court will not absolve PHA of all responsibility for its conduct simply because Plaintiffs could have avoided the danger by living on the street.

<em>c.      Policy or Custom Requirement</em>

In *M.B. v. City of Phila.*, this Court held that in order to establish municipal liability under the state-created danger cause of action, a plaintiff must prove "some municipal policy or custom caused the underlying constitutional violation." Civ. A. No. 00-5223, 2003 WL 733879, at *6 (E.D. Pa. March 3, 2003).[4] PHA contends that Plaintiffs cannot prove the existence of such a policy or custom.

"[A] plaintiff can show that a policy or custom at issue concerns a failure to train or supervise where that failure reflects a deliberate indifference of officials to the rights of persons that come into contact with these municipal employees." *Id.* PHA admitted at oral argument that it gave no training to inspectors about mold. Such a lack of training, coupled with Plaintiffs' evidence that suggests PHA was aware of the dangers of mold during the relevant time period raises a genuine issue of material fact about whether PHA was deliberately indifferent to Plaintiffs' rights. This satisfies the policy or custom requirement necessary to bring a section 1983 claim against a municipal entity.

---

[4] Some judges in this District have reached differing results on the question of whether a plaintiff is required to prove that the constitutional violation came about as a result of a government policy or custom. *See Sciotto ex rel. Sciotto v. Marple Newtown Sch. Dist.*, 81 F. Supp. 2d 559, 574 (E.D. Pa. 1999) (Reed, J.) (finding that the policy or custom theory of municipal liability is a "separate and distinct analysis of liability from the state-created danger theory"); *Combs v. Sch. Dist. of Phila.*, Civ. A. No. 99-3812, 2000 WL 1611061 (E.D. Pa. Oct. 26, 2000) (Buckwalter, J.). Since the Third Circuit has yet to address this issue, this Court will follow its prior decision in *M.B.*

### d. *Qualified Immunity for Individual Defendants*

PHA Defendants argue that even if there was a constitutional violation, the individual PHA Defendants are entitled to qualified immunity. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right;" otherwise the official is entitled to qualified immunity. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Plaintiffs contend that the individual PHA Defendants are not entitled to qualified immunity here because the HQS and the state-created danger doctrine were sufficiently well-established at the time of their conduct. Although the parameters of the state-created danger doctrine and individuals' substantive due process rights under the Fifth and Fourteenth Amendments were reasonably clear by the time of the conduct in question, the evidence strongly suggests that the individual Defendants were not aware that their conduct might violate Plaintiffs' rights thereunder. Specifically, Plaintiffs allege (and PHA admits) that the individual PHA Defendants were not given training on mold and its dangers. Without knowledge of these dangers, the individual PHA Defendants might have known of Plaintiffs' substantive due process right to be free of state-created dangers, but cannot be charged with "understand[ing] that what [they were] doing violates that right." *See Anderson*, 483 U.S. at 640. Therefore, the individual PHA Defendants are entitled to qualified immunity.

### B. Stahls' Motion Against Plaintiffs

#### 1. *Liability for conditions on land*

In Pennsylvania, a lessor of land is not liable to the lessee for physical harm caused by conditions on the land that existed when the land was transferred. *Deeter v. Dull Corp.*, 617 A.2d 336, 338 (Pa. Super. Ct. 1992). The Stahls point to this rule and say they are therefore not liable to the Plaintiffs.

A landlord is liable, however, for an unsafe condition on his property if he is aware of the problem, promises to fix the problem, and fails to do so or negligently does so. *Reed v. Dupuis*, 920 A.2d 861 (Pa. Super. Ct. 2007). The lease for the Scattergood property makes the owner responsible for routine maintenance and repairs necessary to ensure that the premises are in compliance with the HQS. (Lease § 9.) Thus, the Stahls had promised to fix unsafe conditions on the property like water leaks. The records showing McKinney's numerous complaints suggest that the Stahls were also aware of the water leaks. (*See* Tenant Memos.) Finally, the tenant memos and persistent leaks suggest that the Stahls failed to fix the problem. Thus, it appears that Plaintiffs have raised a triable issue about whether the Stahls are liable for the dangerous conditions on the property.

The Stahls' argument to the contrary—that they were unaware of the dangerous condition because they were unaware of the fact that the water leakage was creating mold—goes too far. The dangerous conditions on the land were the excess moisture and persistent leaks, which could have caused harm in a number of ways. In this case, the harm manifested itself via allegedly dangerous mold. The point is the same: the Stahls were aware of the dangerous leaks, promised in the lease to fix them, and allegedly failed to do so.

### 2. Negligence Per Se

The Stahls also ask for summary judgment on Count IV, Plaintiffs' negligence per se claim. A claim of negligence per se cannot be premised on violations of a local ordinance—in this case, the Philadelphia Property Maintenance Code. *See Riegert v. Thackery*, 61 A. 614, 615 (Pa. 1905) ("Proof of the violation of the ordinance was not, in itself, any evidence of the defendant's negligence"); *Ubelmann v. Am. Ice Co.*, 58 A. 849, 850, 209 Pa. 398, 400 (Pa. 1904) ("Proof of the violation of an ordinance regulating or relating to conduct alleged to have been negligent is not in

itself conclusive proof of the negligence charged."). *See also Wisniewski v. Chestnut Hill Hosp.*, 170 A.2d 595, 596 n.1 (Pa. 1961); *Murphy v. Bernheim & Sons, Inc.*, 194 A. 194, 197 (Pa. 1937); *Jinks v. Currie*, 324 Pa. 532, 538 (1936) ("[W]e have held the violation of a municipal ordinance is only evidence of negligence . . . ." (citing *Ubelmann*, supra)).

Plaintiffs attempt to distinguish these cases and cite to language in Pennsylvania Superior Court cases suggesting that violation of an ordinance can constitute negligence per se. *See White v. S.E. Pa. Transp. Auth.*, 518 A.2d 810, 815–16 (Pa. Super. Ct. 1986) ("'Negligence per se' has been defined as 'Conduct . . . which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances . . . because it is in violation of a statute *or valid municipal ordinance* . . . .'" (quoting Black's Law Dictionary 933 (5th ed. 1979)) (emphasis added)); *Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1288 (Pa. Super. Ct. 2005) ("The concept of negligence *per se* establishes both duty and the required breach of duty where an individual violates an applicable statute, *ordinance* or regulation designed to prevent a public harm." (emphasis added)).

Since the cases Plaintiffs cite did not involve the violation of an ordinance, the language therein suggesting that violation of an ordinance can be negligence per se is dicta. Plaintiffs' authority has not abrogated *Riegert* or *Ubelmann*. As stated by the Pennsylvania Suggested Standard Civil Jury Instructions, "[v]iolation of a municipal ordinance is only evidence of negligence, and not negligence per se." Pa. SSJI (CIV) § 3.07 subcommittee note.

Therefore, the Court will grant summary judgment in favor of the Stahls on the issue of negligence per se.

3. *Punitive Damages*

The Stahls request summary judgment on the issue of punitive damages, arguing that Plaintiffs have failed to demonstrate a dispute of material fact on the question of whether defendants' conduct evinced an evil motive or a reckless indifference to the rights of others. The Court believes that Plaintiffs have met their burden on this issue for purposes of summary judgment.

4. *Ms. Stahl*

The Stahls also argue that Ms. Stahl should not be held liable because she was not involved in the maintenance of the Scattergood property. This argument has no legal authority to support it. The Court is aware of no "innocent spouse" doctrine. Ms. Stahl is an owner of the property and thus owed the same duties to the Plaintiffs as her husband.

## IV. CONCLUSION

For the reasons stated above, the Court finds that Plaintiffs do not have a private right of action to enforce 42 U.S.C. §§ 1437f(o)(8) or 1437d(f). However, the Court rejects PHA Defendants' argument that they are entitled to summary judgment on Plaintiffs' state-created danger claim. The Court finds that the individual PHA Defendants are entitled to qualified immunity. The Court will grant summary judgment to the Stahls on the issue of negligence per se, but otherwise will deny their motion for summary judgment.