**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANGELIQUE McKINNEY, as parent** | : | |
| **and natural guardian of EBONY** | : | **CIVIL ACTION** |
| **GAGE and RONALD LEWIS GAGE,** | : | |
| **JR., and in her own right,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PHILADELPHIA HOUSING** | : | |
| **AUTHORITY, *et al.*,** | : | **No. 07-4432** |
| **Defendants.** | : | |

**MEMORANDUM**

Schiller, J.                                                                                          **August 24, 2010**

The Pennsylvania Department of Public Welfare ("DPW") spent over $1.2 million on the

health care of Plaintiffs, Medicaid recipients who later procured a significant settlement from third

parties. Currently in dispute is how much DPW can recoup as a result of that settlement. The parties

briefed the issue and the Court held a hearing on August 5, 2010. DPW and the Plaintiffs have

radically different conceptions of how this issue is to be resolved. For the reasons listed below, the

Court finds neither party's proposed method of allocation persuasive and will order that $537,448.43

be paid from escrow to DPW.


I.      **BACKGROUND**

        A.      **Factual and Procedural Background**

        Plaintiffs were participants in the Housing Choice Voucher Program ("HCVP"), a federal

program in which qualified low-income individuals receive vouchers that they can use to lease

private housing. Federal regulations require that local housing authorities conduct inspections of

homes covered by the HCVP at least annually to ensure they comply with federal housing quality standards. 24 C.F.R. § 982.405(a). Plaintiffs allege that they were injured due to unsafe conditions in their HCVP-approved home. Specifically, they allege that damp conditions and the presence of mold in the home caused and/or exacerbated Plaintiffs' asthma, and led to a tragic respiratory incident on March 18, 2006 that resulted in Plaintiff Ebony Gage being hospitalized for months and rendered permanently brain damaged. (Sec. Am. Compl. ¶¶ 283, 294, 297.) Plaintiffs were deemed eligible for Medicaid, which paid $1,265,896.16 for Plaintiffs' medical bills.[1] DPW has liens in this amount against Plaintiffs' recovery.

Plaintiffs filed a lawsuit in October 2007 against their local housing authority, the Philadelphia Housing Authority ("PHA") and several of its employees under two theories: (1) that the PHA Defendants violated Plaintiffs' rights under the United States Housing Act of 1937, 42 U.S.C. § 1437; and (2) that the PHA Defendants affirmatively exercised their authority in a manner that rendered Plaintiffs more vulnerable to danger, thereby violating Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiffs also sued their landlords ("the Stahls") and the management company that serviced their HCVP home ("Artur Defendants") on a theory of negligence.

On January 11, 2008, PHA and its Executive Director Carl Greene (also a named Defendant) moved to dismiss Plaintiffs' Amended Complaint. The Court denied those motions on April 3, 2008. On February 19, 2010, PHA, the Stahls, and the Artur Defendants each filed extensive motions for summary judgment. On April 20, 2010, the Court ruled on the summary judgment

---

[1] This figure represents the total of DPW's expenditures for Plaintiffs Ebony Gage ($1,248,734.89), Ronald Gage, Jr. ($6,876.52), and Angelique McKinney ($10,284.75).

motions, granting them in part and denying them in part.[2]  The Court held that Plaintiffs did not have

a private right of action to enforce the United States Housing Act but that they could proceed to trial

against PHA on their constitutional "state-created danger" theory and against the Stahls for

negligence.

At the final pretrial conference on April 27, 2010, Plaintiffs informed the Court that they had

reached an agreement with the Stahls and were proceeding only against PHA.  On May 3, 2010, the

Court conducted voir dire and a jury was selected.  Before opening arguments, Plaintiffs and PHA

announced that they had reached a settlement.

DPW was on notice that this case was being prosecuted as early as June 27, 2008.  (Pl.'s

*Ahlborn* Hearing Mem. Ex. F [M. Trunk Letter to DPW Dated June 27, 2008].)  DPW, however, did

not intervene during the prosecution of the case.  After the settlement was reached, but before it was

approved by the Court, Plaintiffs' counsel faxed a letter to DPW claims investigation agent Karen

Georgoulis detailing the terms of the proposed settlement with Defendants and offering to reach an

agreement regarding DPW's lien. (*Id.* Ex. G [M. Trunk Letter to DPW Dated May 17, 2010].)  On

June 2, 2010, Plaintiffs' counsel sent another letter to Georgoulis at DPW, updating her on the

settlement discussions and again raising the issue of an agreement to settle DPW's lien.  (*Id.* Ex. H

[M. Trunk Letter to DPW Dated June 2, 2010].)  On June 3, 2010, DPW sent Plaintiffs' counsel

statements detailing DPW's expenditures on Plaintiffs' medical care.  (*Id.* Ex. I [DPW  Statement -

McKinney]; Ex. K [DPW Statement - R. Gage].)  On June 4, 2010, Plaintiffs' Counsel faxed a letter

to DPW acknowledging the updated claimed expenditures from the June 3 statements, and again

_____

[2] Prior to the Court's ruling, Plaintiffs reached an agreement with the Artur Defendants,
who withdrew their summary judgment motion.

proposing resolution of the liens. (*Id.* Ex. L [M. Trunk Letter to DPW Dated June 4, 2010].)

Also on June 4, 2010, Plaintiffs submitted to the Court a Petition to Approve Settlement. (Pet. to Approve Settlement [Settlement Pet.].) The Petition noted that Plaintiffs' lawyers were in the process of negotiating liens asserted by DPW against Plaintiffs. (*Id.* ¶¶ 19–21.)

On June 8, 2010, DPW sent Plaintiffs' Counsel a request for additional information. (Pl.'s *Ahlborn* Hearing Mem. Ex. M [K. Georgoulis Letter to M. Trunk Dated June 8, 2010].) Plaintiffs' Counsel responded the same day, sending DPW the operative complaint, pertinent expert reports, and the petition to approve settlement, which Plaintiffs' Counsel noted had been filed with the Court. (*Id.* Ex. N [M. Trunk Letter to K. Georgoulis Dated June 8, 2010].)

On June 15, 2010, the Court approved a settlement among the parties, not including DPW, of $11,913,000.00. The settlement contains specific amounts appropriated for litigation costs, attorneys' fees, and payments to the individual Plaintiffs (with payments to the minor Plaintiffs placed in special needs trusts). Anticipating the instant dispute, the Parties placed $1,267,611.41 in escrow—more than the entire amount of DPW's claim—pending resolution of the dispute. The settlement does not specify what proportion of the settlement represents compensation for past medical expenses or any other head of damage (e.g. pain and suffering or lost wages).

On June 18, 2010, DPW sent Plaintiffs' Counsel a letter advising that the matter had been referred to Jason Manne of DPW's Office of General Counsel. (*Id.* Ex. O.) On July 8, 2010, DPW moved to vacate the settlement reached in this case or in the alternative, to intervene. The Court denied DPW's motion to vacate the settlement, but granted its motion to intervene and scheduled a hearing for August 5, 2010 to determine how much DPW may collect under its lien. Plaintiffs and DPW were each asked to submit briefs outlining the relevant substantive and procedural law.

Counsel for Plaintiffs and DPW filed briefs and presented arguments to the Court at the August 5, 2010 hearing. Counsel for Plaintiffs also offered into evidence exhibits relevant to its theory of the issue.

### 2. *Ahlborn*

The issue before the Court is how much of its $1,265,896.16 expenditure DPW can recoup as a result of Plaintiffs' settlement. This question undoubtedly is affected by the Supreme Court's decision in *Arkansas Department of Health and Human Services v. Ahlborn*, 547 U.S. 268 (2006), so the Court will begin there.

In *Ahlborn*, a young woman was involved in an accident and qualified for Medicaid assistance from the State of Arkansas. *Id.* at 272. The Arkansas Department of Health and Human Services (ADHS) paid medical providers $215,645 on her behalf. *Id.* at 273. ADHS was not involved in the litigation, which resulted in the beneficiary reaching a settlement of $550,000. *Id.* at 274. The parties did not allocate the settlement among categories of damages. *Id.* ADHS placed a lien against the award for the full amount of its expenditure, claiming that it was entitled to complete reimbursement from any settlement money the beneficiary received, regardless of whether or not the money was designed to cover medical expenses. *Id.*

Ahlborn sued in federal court seeking a declaration that the lien violated the federal Medicaid laws insofar as ADHS sought to recover settlement monies that were not attributable to past medical expenses. *Id.* To facilitate the District Court's resolution of the legal questions presented, the parties stipulated that Ahlborn's entire claim was reasonably valued at $3,040,708.12; that the settlement amounted to approximately one-sixth of that sum; and that therefore the portion of the settlement attributable past medical expenses was approximately one-sixth of ADHS's $215,645 expenditure,

or $35,581.47. *Id.*

The Supreme Court held that ADHS could not recover any funds that did not represent payment for medical expenses. *Id.* at 284–85. Examining the federal Medicaid statute, the Court first noted that 42 U.S.C. § 1396(p) establishes a general "anti-lien" rule, barring states in most instances from placing liens on Medicaid beneficiaries' property. *Id.* at 284. However, the Court noted that the Medicaid statute allows states to require Medicaid beneficiaries to assign to the state the beneficiaries' right to recover payments for medical care from third parties, and thus there are exceptions to the general anti-lien rule. *Id.* (citing 42 U.S.C. §§ 1396a(a)(25) and 1396k(a)). Since Medicaid creates a default anti-lien position and makes a specific exception for recovery of medical expenses, the Court held that states could not place liens on funds that compensated for damages other than medical expenses. *Id.*

In so deciding, the Court rejected the argument that a rule of full reimbursement was necessary to avoid settlement manipulation—the risk that plaintiffs and defendants would stipulate that only a small portion of their settlement was attributable to medical expenses and thereby prevent the state medical agency from recovering its rightful share. *Id.* at 288. The Court noted that the question of what portion of a settlement was attributable to medical expenses could be submitted to a court, but offered little guidance on how to make such a determination. *See id.* The Court however left open the possibility that courts could apply State "rules and procedures for allocating tort settlements . . . to meet concerns about settlement manipulation." *Id.* at 288.

3.     **The Parties' Positions**

A.     *Plaintiffs' argument*

Plaintiffs contend that the portion of the settlement that can be considered compensation for

6

medical expenses can be calculated by determining the ratio of Plaintiffs' settlement to the "true value" of their underlying claim and multiplying that ratio by the lien. For the sake of convenience, the Court will refer to this as the "ratio theory." An example illustrates: Imagine that a plaintiff has a claim that is "worth" $36 million and that a state medicaid agency holds a lien for $3 million, representing the expenditures it made for the plaintiff's medical treatment. If plaintiff settles his case with the alleged tortfeasor for $12 million, the ratio theory posits that plaintiff has settled for only one-third of the "true value" of his claim ($12 million divided by $36 million). The ratio theory further assumes that by settling for one-third of the value of his *total* claim, plaintiff has settled for one-third of his lost future wages, one-third of his pain and suffering damages, one-third of his disfigurement damages, one-third of his humiliation damages, and so on. Therefore, under this logic, plaintiff has settled for one-third of his *past medical expenses*, so $1 million of the $12 million dollar settlement ($3 million past medical expense claim multiplied by one-third) is properly attributable to medical expenses and thus the state medicaid agency is entitled to collect only $1 million (minus the state's appropriate share of attorneys' fees and costs) of its original $3 million lien.[3]

In their initial brief on this issue, Plaintiffs argued that the true value of Plaintiffs claim was over $45 million and that the $11.9 million settlement thus represents a recovery of less a third of the claim's value. Thus, after accounting for this reduction and DPW's share of costs and fees, Plaintiffs contend that DPW is entitled to approximately $200,000. To prove this, Plaintiffs offered into evidence several expert reports purporting to calculate the "true value" of Plaintiffs' case. The

---

[3] The ratio theory can alternatively be described as requiring a court to calculate the state's lien divided by the "true value" of plaintiff's claim, then multiply that ratio by the settlement amount. Thus, in the example above, this would mean that the state's lien represented 1/12th of the "true value" of plaintiff's claim, and thus the state could only collect 1/12th of the $12 million settlement: $1 million.

life care plan prepared by Betsy Bates of Rehab Nurse Consultants estimated that the cost of nursing services for Ebony Gage would be between $17,402,459 and $31,897,104. A report prepared for Plaintiffs by Michael Wachter, a Professor of Law and Economics at the University of Pennsylvania, estimated that Ebony Gage's lost earnings capacity is between $2,176,775 and $4,019,551. Plaintiffs also introduced a report prepared by Dr. Guy Fried and a video recording of Ebony Gage, both of which aimed to demonstrate Ebony Gage's pain and suffering. Plaintiffs also introduced an excerpt from a trial transcript in a case tried in the Court of Common Pleas, Allegheny County, in which the jury awarded $26,500,000 to a plaintiff for non-economic loss. Plaintiffs argued during the hearing that the injuries in that case were similar to those experienced by Plaintiffs.

> *B.     DPW's Argument*

DPW argues that the "true value" of Plaintiffs' underlying claim is irrelevant to determining what portion of the settlement is appropriately considered compensation for medical expenses. Under DPW's theory, the only thing that restricts DPW's recovery is state law.

First, DPW argues that Plaintiffs cannot argue for the ratio theory because "[u]nder Pennsylvania law . . . a settlement conclusively establishes the settlement amount as full compensation for the damages sustained by the settling plaintiff and essentially operates as a waiver of any right that he or she may otherwise have to a judicial determination of his or her losses." *Tristani v. Richman*, 609 F. Supp. 2d 423, 465 (W.D. Pa. 2009).

Second, Pennsylvania statutory law provides that acceptance of medical assistance benefits "shall operate as an assignment to the [DPW] . . . of the assistance recipient's rights to recover . . . support for the payment of medical care, and to payment for medical care from any third party." 62 PA. CONS. STAT. § 1404(b). Pennsylvania statutory law also allows DPW to place a lien against the

beneficiary's recovery for reimbursement of Medicaid outlays, but such a claim cannot "exceed one-half of the beneficiary's recovery after deducting for attorney's fees, litigation costs, and medical expenses relating to the injury paid for by the beneficiary." *Id.* § 1409b(11).

The Pennsylvania legislature gave DPW the power to adopt rules and regulations to carry out the law's provisions. *Id.* § 1410. Pursuant to that authority, DPW adopted the following regulation:

> In determining the portion of a tort recovery that represents payment for medical care by a third party, the Department will apply the following interpretations:
>
> (1) . . .
>
> (2) In the absence of a court order allocating tort proceeds among categories of damages, 1/2 of the net proceeds are allocated by law to be available to repay injury-related [Medicaid] expenses. The amount of net proceeds is computed by deducting from the gross proceeds the attorney's fees, litigation costs and medical expenses relating to the injury that were paid for by the beneficiary prior to the settlement of the injured beneficary's action or claim.
>
> (3) If the beneficiary or other party seeks to obtain a court order limiting the portion of the tort recovery from which [Medicaid] reimbursement may be paid to an amount less than 1/2 of net proceeds, or excluding amounts paid by the [Medicaid] Program from the recovery, the Department shall be given fair notice and an opportunity to protect its interest.
>
> (4) Failure to provide the Department with fair notice and an opportunity to protect its interest, prior to obtaining a court order limiting the portion of a tort recovery from which [Medicaid] reimbursement may be paid, constitutes a violation of section 1408(a)(1) of the Public Welfare Code (62 P. S. § 1408(a)(1)).

55 PA. CODE § 259.2(b). DPW therefore argues that Pennsylvania state law establishes a presumption that half of a plaintiff's settlement is properly attributed to compensation for medical expenses and therefore, DPW can lawfully collect its full lien because that amount does not exceed half the total settlement in this case.[4]

---

[4] On July 4, 2008, the Pennsylvania legislature added the following to the statutory law:

In addition, DPW argues that *Ahlborn* permits a state to assert a lien against any payment a beneficiary recovers as compensation for medical expenses, whether past *or future*. DPW points the Court to the Idaho Supreme Court's decision in *In re Matey*, in which the court stated, "[t]he [*Ahlborn*] court made no distinction between damages for past medical care and those for future medical care. Nothing in 42 U.S.C. § 1396p indicates that the State may not seek recovery of its payments from a Medicaid recipient's total award of damages for medical care whether for past, present, or future care." 213 P.3d 389, 394 (Idaho 2009). According to DPW, more than half of what Plaintiffs sought to recover from Defendants was attributable to future medical expenses. Therefore, DPW argues that, if the Court is inclined to accept Plaintiffs' ratio theory, DPW still can collect its full lien because at least $1.26 million of Plaintiffs' settlement is attributable to past and future medical costs.

## III. DISCUSSION

Both Parties' proposed methods for resolving this issue are problematic. To begin with,

---

> If the action or claim is prosecuted by the beneficiary alone, the court or agency shall first order paid from any judgment or award the reasonable litigation expenses, as determined by the court, incurred in preparation and prosecution of the action or claim, together with reasonable attorney fees. After payment of the expenses and attorney fees, the court or agency shall allocate the judgment or award between the medical portion and other damages and shall allow the department a first lien against the medical portion of the judgment or award, the amount of the expenditures for the benefit of the beneficiary under the medical assistance program.

P.L. 557, Act No. 2008-44 (codified at 62 Pa. Cons. Stat. § 1409.1(b)(1)). That provision is effective for actions filed on or after July 4, 2008. *Id.* §§ 12–13. The Complaint in this case was filed in October 2007.

Plaintiffs are flat wrong when they argue that their ratio theory is required by *Ahlborn*. The parties in *Ahlborn* stipulated as to the portion of their settlement that represented compensation for medical expenses and in doing so, they appear to have used a calculation similar to the one Plaintiffs propose here. *See Ahlborn*, 547 U.S. at 274; *Ahlborn v. Ark. Dep't of Human Servs.*, 397 F.3d 620, 622 (8th Cir. 2005) ("The parties have entered into a stipulation regarding damages, whereby the State will recover $215,645.30 if it prevails on the statutory construction issue, but only $35,581.47 if Ahlborn prevails. This first figure represents the total amount the parties stipulated the State paid in relation to Ahlborn's care. The parties stipulated that the second figure, which represents 16.5 percent of this total amount, is a fair representation of the percentage of the settlement constituting payment by the tortfeasor for past medical care."). However, it does not follow that all other parties are bound to apply this calculation merely because the parties in one case agreed to use it. The *Ahlborn* Court did not entrench the parties' method of calculation. *See Scharba v. Everett L. Braden, Ltd.*, Civ. A. No. 07-1294, 2010 WL 1380121, at *4–5 (M.D. Fla. Mar. 31, 2010); *Lima v. Vouis*, 94 Cal. Rptr. 3d 183, 197 (Cal. Ct. App. 2009) (noting that trial courts need not apply ratio theory, so long as approach used is "rational," "fair and equitable"); *McMillian v. Stroud*, 83 Cal. Rptr. 3d 261, 270 (Cal. Ct. App. 2008); *Espericueta v. Shewry*, 79 Cal. Rptr. 3d 517, 524–25 (Cal. Ct. App. 2008); *Andrews v. Haygood*, 669 S.E.2d 310, 313 (N.C. 2008) ("The *Ahlborn* holding, limited by the parties' stipulations, did not require a specific method for determining the portion of a settlement that represents the recovery of medical expenses.").

The second problem with Plaintiffs' ratio theory is that it requires a judicial ascertainment of the platonic "true value" of Plaintiffs' claims. At best, this would convert *Ahlborn* hearings into mini-trials, replete with competing damages experts and witnesses testifying as to issues like

humiliation, pain and suffering, and loss of enjoyment of life. This would seriously undermine the economy of settlement. At worst, this would send judges on a quixotic intellectual journey in search of an illusory number.

Aside from the logistical difficulties that Plaintiffs' theory would produce, it also suffers from a logical failing. Why should one assume that simply because Plaintiffs settled for a fraction of the supposed "true value" of their claim, that this fractional reduction applies uniformly across the various heads of damage? For example, a plaintiff's past medical expenses can more easily be proven to a jury than can a plaintiff's non-economic damages. Therefore, plaintiffs face less uncertainty regarding recovery of medical expenses and thus will be less willing during settlement talks to reduce their request for past medical expenses than for other, more uncertain heads of damage.

DPW's proposal is also not free of troubles. *Ahlborn* directs that a state cannot place a lien on a medicaid recipient's settlement with a third party other than that portion attributable to payments for medical expenses. DPW suggests that the Pennsylvania legislature has created a binding legal presumption that the portion of a medicaid beneficiary's settlement with a third party tortfeasor representing medical benefits is the lesser of the full amount of the state's lien or fifty percent of the beneficiary's total settlement (the "full lien or half the settlement" presumption). This is incorrect for several reasons. First, the notion that the Court is bound to apply this presumption is belied by DPW's own regulation, which states that it applies "[i]n the absence of a court order allocating tort proceeds among categories of damages." 55 PA. CODE § 259.2(b)(2).[5] Thus, DPW's

_____

[5] Furthermore, the recent amendments to the Pennsylvania statute indicate that the Legislature does not seek to bind courts to award DPW the lesser of its whole lien or 50% of the settlement. Those amendments provided that a court "shall allocate the judgment or award

own regulation envisions that a court order trumps its presumption. The Court need not assess the constitutionality of the Pennsylvania law in order to reject its application here and make a judicial allocation of the settlement among categories of damages.

DPW argues that Plaintiffs are not entitled to rely on the "court order" provision of its regulation because they did not provide DPW with adequate notice. The regulation states that "[i]f the beneficiary . . . seeks to obtain a court order limiting the portion of the tort recovery from which [Medicaid] reimbursement may be paid to an amount less than 1/2 of net proceeds, or excluding amounts paid by the [Medicaid] Program from the recovery, the Department shall be given fair notice and an opportunity to protect its interest." 55 PA. CODE § 259.2(b)(3). Here, DPW was given notice and an opportunity to protect its interest, as funds were set aside from the settlement sufficient to satisfy DPW's full lien and DPW was given an opportunity to submit briefs and participate in oral argument regarding the determination of how much of its lien it could collect.

It is true that DPW's regulation states that "[t]hirty days advance notice is considered reasonable advance notice" and that the record indicates Plaintiffs notified DPW of the proposed settlement on May 15, 2010, which is 29 days before the Court approved the settlement on June 13, 2010. *Id.* § 259.2(c)(5). However, this does not mean that DPW was not given reasonable advance notice. First, the regulation states that DPW considers thirty days to be reasonable advance notice; it does not say that anything less is inadequate. Second, DPW would be hard pressed to argue that

_____

between the medical portion and other damages and shall allow the department a first lien against the medical portion of the judgment or award." 62 PA. CONS. STAT. § 1409.1(b)(1). Such an allocation would be unnecessary if DPW's presumption is correct. Therefore, while § 1409.1 does not bind the Court in this case, the Court believes it indicates the Pennsylvania legislature's preference for a case-by-case judicial apportionment of settlement awards, rather than a rote application of DPW's self-serving presumption in every instance.

30 days notice would be adequate but one day less would be insufficient. Finally, for all practical purposes, DPW had sufficient notice and could have sought to intervene at any point. It had several *years* to intervene in this case, including several weeks after it had been informed of the specific terms of the proposed settlement. Therefore, the Court rejects any contention that the Department was not given fair notice and an opportunity to protect its interest.

In addition, even if Pennsylvania state law purported to dictate the allocation of a settlement among various categories of damages, it is not clear that a court would apply such a law. The Supreme Court in *Ahlborn* explicitly raised but declined to decide the question of whether a court conducting an *Ahlborn* hearing could apply state laws to address the risk of settlement manipulation. 547 U.S. at 288 n.18. Several federal courts sitting in different states have applied state laws similar to Pennsylvania's statute in deciding that a state agency is entitled to the lesser of the full amount of their lien or a statutorily prescribed percentage of the beneficiary's settlement. *See Scharba*, 2010 WL 1380121; *Armstrong v. Cansler*, Civ. A. No. 07-37, 2010 WL 2629740 (W.D.N.C. June 28, 2010). However, states are not unfettered in their ability to statutorily define how much of every settlement is attributable to past medical expenses, lest they dictate that 100% of settlement proceeds are, by force of law, considered compensation for past medical expenses. This would obviously be in tension with the Federal Medicaid statute and would raise serious Supremacy Clause concerns. Since a rigid application of the DPW's regulation creates possible constitutional concerns, the Court believes it is not a reasonable interpretation of the statute and will not adhere to it.

Furthermore, the application of DPW's proposed rule in this case would require the Court to make an absurd assumption. DPW would have the Court assume that Defendants in this case paid almost $6 million to Plaintiffs to compensate them for past medical expenses that total roughly $1.26

14

million.  DPW's proposed rule would take this certain figure, evidenced by medical bills and records, and render it meaningless for purposes of the Court's analysis.

Finally, DPW's proposed rule ignores the reality of settlement.  Settlement, by its very nature, involves compromise.  In a legal system where outcomes are uncertain, parties settle to hedge against the risk of an unfavorable outcome.  DPW's proposed rule amounts to a "heads I win, tails you lose" scenario.  Had Plaintiffs taken this case to a jury verdict and been awarded $1.26 million as compensation for past medical expenses, DPW would undoubtedly be entitled to that money (less attorneys' fees and costs).  DPW would also have it that if Plaintiff traded away some of its recovery prospects for certainty (and cash) via a settlement, DPW would reap the benefits without giving up anything.  That is not the way settlement works.  When parties settle, everyone sacrifices.  DPW's suggestion that it does not need to sacrifice (unless its lien is for more than half of a plaintiff's total recovery) ignores this reality.

The Court also rejects DPW's argument that *Ahlborn* permits states to encumber settlement monies attributable to *future* medical expenses.  Firstly, the Court in *Ahlborn* noted that Ahlborn was seeking damages "not only for past medical costs, but also for permanent physical injury; *future medical expenses*; past and future pain, suffering, and mental anguish; past loss of earnings and working time; and permanent impairment of the ability to earn in the future."  547 U.S. at 273 (emphasis added).  This suggests that the Court, when it spoke of "medical expenses" in the remainder of the opinion, was referring to past medical expenses.  Second, the Medicaid statute says that a state must,

> to the extent that *payment has been made* under the State plan for medical assistance
> in any case where a third party has a legal liability to make payment for such
> assistance, [have] in effect laws under which, to the extent that payment has been

15

made under the State plan for medical assistance . . . to an individual, the State is considered to have acquired the rights of such individual to payment by any other party for *such* health care items or services.

42 U.S.C. § 1396a(a)(25)(H) (emphasis added).  It is clear from a reading of this statutory language that the italicized word "such" refers to the "payment [that] has been made"—that is, the payments the state made on the beneficiary's behalf *in the past* for medical expenses.  Therefore, it would appear that DPW cannot draw on portions of the settlement designed to compensate for future medical expenses in order to reimburse itself for *past* medical expenditures.

The proper allocation lies between the Parties' requests.  Having presided over this hotly contested case for nearly three years, this Court is in the best position to assess the factors that would have influenced the Parties' settlement positions and to make an ultimate determination of what portion of the settlement represents compensation for past medical expenses.  Having seen a motion to dismiss, several motions for summary judgment, *Daubert* motions, the pre-trial stipulation, the parties' witness and exhibits lists, and having presided over three different hearings in this case, this Court is intimately familiar with this litigation and can make a fair and reasonable assessment of how much of the settlement should be apportioned to past medical expenses.

The Court will start with the principle that the largest portion of the settlement that rightfully can be attributed to past medical expenses is $1,265,896.16, the amount DPW spent on Plaintiffs' medical care.[6]  Second, the Court finds that, if Plaintiffs prevailed on the merits of their case, a jury would award them the full amount of compensation they requested for past medical expenses: $1,265,896.16.  This is so because past medical expenses can be readily quantified and presented to

---

[6] There is no evidence that Plaintiffs incurred any other past medical expenses for which Defendants might have been liable other than the $1,265,896.16 in medical bills which DPW paid.

a jury and there would be no reason for a jury to find Defendants liable but not award Plaintiffs damages to make them whole for past medical expenses. Thus, the primary area of uncertainty for the Parties as they prepared to settle Plaintiffs' past medical expenses request was whether Plaintiffs would prevail on the liability issue. Courts are often called upon to assess the risks plaintiffs would face in establishing liability had they gone to trial in the context of approving class action settlements. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). This determination does not necessitate a mini-trial after the settlement has been reached. *See Lachance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997) ("If settlement is to have any utility toward reducing the burden litigation places on the courts and litigants, the court must guard against conducting a mini-trial on the merits in order to determine the plaintiffs' likelihood of establishing liability."). Rather, a Court can assess the risks of establishing liability based on the pleadings and other materials that have come before the Court during the life span of the case. *See id.* at 638–42.

To establish a claim against PHA based on the state-created danger doctrine, Plaintiffs would have had to prove that: (1) the harm caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) some relationship existed between the state and the plaintiff that renders the plaintiff a foreseeable victim; and (4) "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Bright v. Westmoreland County,* 443 F.3d 276, 281 (3d Cir. 2006) (citations omitted). To prevail against the Stahls, Plaintiffs would have had to prove that the Stahls were aware of problems in the home, promised to fix the problems, and failed to do so or did so negligently. *Kobylinski v. Hipps*, 519 A.2d 488, 491 (Pa. Super. Ct. 1986). To prevail against the Artur Defendants, Plaintiffs would have had to prove

that they attempted to provide services to Plaintiffs; that they recognized that those services were necessary for the protection of Plaintiffs' themselves or their things; that they failed to act with reasonable care in performing those services; and that their negligent acts increased the risk of harm to Plaintiffs. *Hamil v. Bashline*, 392 A.2d 1280, 1286 (Pa. 1978).

Plaintiffs had a strong case against Defendants. If this case had gone to trial, Plaintiffs would have produced evidence of years of bungled inspections by PHA. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Exs. G, H, I, M, N, Q, R, S, W, AA, BB, CC, GG, II, JJ, PP, RR, SS, ZZ, AAA.) They also would have pointed to bureaucratic conduct on PHA's part that delayed Plaintiffs in their effort to move out of the arguably dangerous home. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Exs. W, CCC, DDD, EEE.) Plaintiffs would also have offered evidence that they informed the Artur Defendants and the Stahls of serious water problems in the home, that the Stahls authorized the Artur Defendants to undertake repairs, that the Artur Defendants attempted to make repairs, and that the repairs were ultimately unsuccessful in abating the leaks within the home. (Pl.'s Resp. in Opp'n to Mot. for Summ. J. of PHA Defs. Exs. W, Z, DD, EE, FF, MM.) They also would have presented evidence of a young girl permanently and severely disabled by events completely outside of her control—a fact that the parties undoubtedly believed would have affected a jury's determination. All of this evidence was quite powerful and very likely could have convinced a jury that Plaintiffs had met their burden of proving their state-created danger and negligence claims.

However, Plaintiffs did not have an inexorable ride to victory. DPW admitted as much at oral argument, saying that Plaintiffs' attorneys had done an effective job in prosecuting a difficult case and procuring a settlement. Defendants were prepared to present expert testimony that Ebony Gage's injury was more consistent with anaphylaxis than asthma, and thus raise doubts as to the

actual cause of her injuries. (PHA Mot. to Preclude Expert Evidence Pursuant to *Daubert* Ex. 13.) Defendants would also have pointed out to the jury that on the night of Ebony's tragic respiratory episode, her mother Angelique McKinney was not home, and the little girl was without adult supervision after midnight when she started having trouble breathing. (PHA Mot. for Summ. J. Ex. J.) Defendants would also have presented evidence indicating that Ms. McKinney continued to renew her lease for several years despite being aware that the home she was living in suffered from serious water issues and that PHA had given her a voucher to move to another HCVP home seven months before Ebony's tragic injury. (*Id.* Exs. A, P-5, P-17, D-12.)

Plaintiffs and Defendants were obviously aware of these facts and would have considered them in deciding whether to settle Plaintiffs' past medical expense request and for what amount. Furthermore, Counsel for the parties (all experienced trial lawyers) undoubtedly informed their clients that juries sometimes do unpredictable things and that they could face an extreme verdict against them. Plaintiffs faced further concern about whether they would be able to collect on any eventual judgment against Defendants. The speed and certainty of an immediate cash settlement were far more favorable to Plaintiffs than the difficulty of collecting judgment against Defendants whose assets were possibly quite illiquid.

Based on an assessment of all of these considerations, the Court makes a finding of fact that Plaintiffs and Defendants agreed to eliminate the uncertainties enumerated above and settle each Plaintiff's request for compensation for past medical expenses in exchange for Defendants paying two-thirds of the amount each Plaintiff requested for this head of damage: $843,930.77.[7] This

---

[7] This corresponds to a reduction of Ebony's claim from $1,248,734.89 to $832,489.93, of Ronald's claim from $6,876.52 to $4,584.35, and of McKinney's claim from $10,284.75 to $6,856.50.

amount reflects the portion of the $11,913,000 settlement that is attributable to past medical expenses and is the only amount from which DPW can recover for its previous expenditures.

DPW shall not recover $843,930.77, however, because it must pay its pro-rata share of Plaintiffs' expenses in prosecuting the underlying case—attorneys' fees and costs. *Cataldi ex rel. Cataldi v. Methodist Hosp.*, 747 A.2d 1239, 1240 (Pa. Super. Ct. 2000); *O'Neil v. Henry's Riverside Mkt.*, 566 A.2d 307, 309 (Pa. Super. Ct. 1989) ("[W]e find ample support in the language of [62 PA. CONS. STAT.] § 1409 to require the appellant to be debited its prorata share of attorney's fees for counsel for the minor's efforts in creating the fund from which the distribution was being made without any assistance or aid from the appellant."). DPW argues that its obligation to pay attorneys' fees pursuant to section 1409 should be reduced because Plaintiffs challenged DPW's right to collect the full amount of the lien, thus forcing DPW to hire its own lawyer and incur its own fees. The Court disagrees. Plaintiffs' Counsel did the hard work to procure a settlement from which DPW now benefits. The fact that Plaintiffs held an incorrect view of the *Ahlborn* decision and pursued that position does not, in this case, warrant a reduction in DPW's obligation to contribute to the cost of prosecuting the underlying case. After all, DPW's view of the appropriate resolution of this dispute was also off target. Contrary to DPW's suggestion, this does not result in any kind of double payment to Plaintiffs' lawyers, because they have received their fees and stand to collect nothing more as a result of the instant dispute. DPW's obligation to pay attorney's fees acts as a set-off against what Plaintiffs are obligated to hand over as reimbursement to DPW—it is not an additional payment to Plaintiffs' lawyers. The funds being allocated today all currently sit in escrow and are being apportioned between DPW and Plaintiffs. DPW's recovery therefore, must be reduced by one-

third for attorney's fees, or $281,310.26.[8]

As for costs, $843,930.77 is roughly 7.08% of the total settlement procured, and therefore DPW's recovery will be reduced by that percentage of the costs. The Court approved costs of $355,331.34, so DPW's share of the costs is $25,172.09.[9] This means that, in the end, DPW is entitled to collect $537,448.43.


IV.    **CONCLUSION**

The Supreme Court's decision in *Ahlborn* envisioned that trial courts would be called upon to determine what portion of a settlement is properly allocated to compensation for past medical expenses, but offered little guidance as to how that figure was to be determined. This Court holds that the method of determining this figure is neither Plaintiffs' proffered "ratio theory" nor DPW's proposed "full lien or half the settlement" presumption. Instead, the Court has considered the risks and uncertainties Plaintiffs faced in prevailing on their underlying claim and their probability of recovering past medical expenses in particular. With those considerations, the Court calculated the amount of Plaintiffs' settlement that represents compensation for past medical expenses and determined that DPW is entitled to $537,448.43. An appropriate Order will be docketed separately.

---

[8] This represents $277,496.64 from Ebony's claim, $1528.12 from Ronald's claim, and $2285.50 from McKinney's claim.

[9] This represents $24,830.84 from Ebony's claim, $136.74 from Ronald's claim, and $204.51 from McKinney's claim.